Good afternoon, Your Honor. May it please the Court, I'm Aaron Nassihi on behalf of Nissan North America, and I'll save three minutes for a bustle that I'll keep track of. And I did want to just thank the panel for the special setting today. Your Honors, this case involves an alleged failure to warn that Nissan's panoramic sunroofs may break more frequently from external impacts when compared to non-defective sunroofs. The district court here incorrectly certified a 10-year class of hundreds of thousands of current and former owners and lessees of cars with large sunroofs across four states, even though 499 out of 500 drivers never ever had a failure. The district court's order rests on three pillars, each of which here is broken. First, the expert evidence failed to identify a common defect to unite highly individual complaints or a individual standing issues predominate, especially for former owners like the Colorado and New York class representatives who passed on any alleged overpayments. Last, the district court expanded state law to make common issues predominate, and I'll address each of those in turn. Starting with the expert evidence, plaintiffs claim the class members overpaid due to an undisclosed risk that external impacts caused panoramic sunroofs to break more easily than non-defective sunroofs. They speculate the design features like size, fret, and glass thickness may be the culprits. But Grodzitski recognizes that it's insufficient for an expert to give a comparative opinion, merely stating a broad theory of insufficient durability without any comparative evidence of what constitutes adequate durability. Here, plaintiffs presented no comparative evidence. The only survey came from Nissan, and it considered warranty data, contacts with Techline, and complaints made to NHTSA, National Highway Traffic Safety Administration. Nissan's data showed the per-sold vehicle year rate was 0.02%. Council, are you arguing the merits? Since we're up here on review of the class certification doesn't require proof of the defect, just that it's susceptible to class-wide treatment. So why isn't the theory here that this spontaneous shattering happenings because of the type of design of the tempered glass and different elements, why isn't that susceptible to common proof one way or the other, whether you're right or not? Well, the issues here are not pure merits issues. There's an overlap here, and the expert evidence here is needed by plaintiffs to show a common defect to unite highly individual complaints. Otherwise, there's a given that plaintiff's position is that external impacts cause these breaks, the sunroof should be breaking for any number of reasons. Trees falling on them, rocks hitting them, and to try and unify all of these disparate complaints, plaintiffs need to present evidence of a common defect, just like in Grodzycki, just like in... But Grodzycki was about a claim that this regulator should last the life of the car, and so that, you know, in that posture we dismissed or we affirmed the exclusion of the expert's report. Here, the district court found tribal questions on these defect claims. So if we're just focusing on the certification side, why isn't that something that's subject to class treatment? Well, Grodzycki involved essentially the same theory here, that the window regulators should last the life of the vehicle. Here, the plaintiff's position is that the sunroofs should last the life of the vehicle. It's the same claim, essentially, as Grodzycki. And ultimately, the theory presented in Grodzycki is no different than... I mean, I thought the plaintiff's theory was a number of these sunroofs, these panoramic ones, just spontaneously shatter. And I think the agencies look at this with a, correct me if I'm wrong, maybe 4,000 of these cases that have occurred. And so it's just for different reasons that the plaintiff's, say, is a design flaw in the thinness of the glass, you know, different aspects of it. Those aren't allegations that they should last forever. Those are allegations that, due to different reasons, they just spontaneously burst. And that's where the complaint, the theory in the complaint, is divorced from the theory presented at class certification. Now, in the Memorandum of Disposition, the Ninth Circuit, the theory presented at the Ninth Circuit there was just that. It was just that these sunroofs were breaking for no external reason, no external cause. Hence, the materiality analysis there kind of focused on that issue. By the time we got to the class certification here, both the agency and plaintiffs acknowledged that that theory was entirely wrong. The entire theory that this complaint had been filed upon, every single iteration of the six versions of the complaint that were filed, and all the allegations made here were wrong, that the sunroofs were breaking because of external impacts. But the theory kind of boiled down to the glass should have broken from external impacts. So, by its very nature, plaintiffs presented a comparative defect theory to try and tie together all these individual complaints that they... But if you're right and there is no common defect, that will resolve the case in one fell swoop for the entire class. So, it seemed to me that even if you're correct, that would resolve the class claim, that would resolve the claims on a class-wide basis. So, for purposes of our review, whether the certification order was properly granted, doesn't that suggest that it was? No, it does not, for the exact same reasons as Grodzitski. And let's not forget that the Beattie v. Ford case went to class certification, and it was on this ground, on a Rule 23 ground, based on the absence of a proper comparative defect evidence, that Judge Zille in the Western District of Washington denied certification in a very thoughtful order. That's the exact same reason that the Condash District Court in the Southern District of Ohio denied certification was the absence of this common defect evidence to unite the disparate class members. That went up to the Sixth Circuit, and in a speaking denial of the 23-F there, the Sixth Circuit said the same thing there. So, here, the comparative data was an essential component of plaintiffs' claims. And, I mean, without that comparative defect and comparative data to support a comparative defect, there's just no baseline with which to measure what the plaintiffs' claims here are as to any potential defect. And I'll just give a hypothetical on this, and that's suppose, for example, the panoramic sunroofs were thicker, suppose that they were smaller, there's no dispute they'd still break from external impacts. So whether you go from the 450 breaks out of 300,000 units out there in the class States to 350. Ginsburg. I guess I'm having the same problem as Judge Sanchez. That's not what they're alleging. They're alleging that they spontaneously and explosively shatter. It's not from something hitting them or whatever. So, these are just spontaneous shattering of windows that are sunroofs. They are alleged. That's correct. That's what's alleged. And we were... And they're not alleging design defect. They're saying it should have been something that was disclosed. I should have been clear. That's correct. That's what's alleged in all six versions of the complaint. But that's not the theory presented at class certification. That's the issue here. And we raised this with Judge Oreck and said, look, they've changed their theory wholesale. This needs to be looked at differently. We also raised this exact same issue with Judge Martinez in the Western District of Washington in the identical law case, which was traveling at the same time as this case with the same expert submissions, same depositions, everything coordinated between the two. And Judge Martinez there observed that, yes, plaintiffs had done a 180-degree turn at class certification. That's no longer their theory. And that changes the whole materiality analysis here because there's a difference between a consumer being told that a sunroof may spontaneously break for no external reason whatsoever versus a consumer being told that if a rock hits it, it may be more likely to break versus these kinds of sunroofs. So that, I think, crystallizes the issue here. Now, plaintiffs here, their theory is essentially a circular theory. And just to paraphrase Judge Wilson from Grodzitski, they're essentially saying the sunroofs here are defective because they don't last as long as they should. And because they're defective, we don't need to show that they don't last as long as they should. Now, that's a circular theory that Judge Zille rejected in Beattie. It was rejected in Condash. But here, the district court failed to apply Grodzitski 702 to the expert evidence and then failed entirely to take that second step, which led to reversal in LSV-Costco of thereafter, once it deemed the evidence admissible, doing the rigorous analysis to determine the persuasiveness of both sides' evidence. Now, I did also want to focus on the expert issue with respect to damages model here, which only addressed price premium for new cars at the very first sale. As a district court put it, the number is tied entirely to new sales Nissan itself made without penalizing it for any used car sale. But this gerrymandered damages model really heightens a mismatch here, as it means that the California name plaintiff and the New York name plaintiff are no longer part of the classes they seek to represent. Both of them bought used cars and bought their cars. But aren't those weight, evidentiary weight issues, as opposed to something for class certification? One of your initial arguments was that you couldn't perform a conjoint analysis, and I think that LIDL sort of resolves that issue. But it seems as if what you're describing now is something that would go to, you know, how meaningful the damages model will be at trial, as opposed to whether it's sufficient for purposes of class certification. And that's an important point, Judge Sanchez, on LIDL. LIDL, we think, supports this. That is an important issue I'd like to come back to. But to this point, Your Honor, there isn't — this isn't an evidentiary abuse of discretion issue. It's undisputed — it is undisputed that Ms. Johnson, the California class representative, that her vehicle was first sold new in a non-class state in Nevada. Second sale happened in Nevada, too. With Plaintiff Cherney in New York, undisputed the first sale of that vehicle. The new sale happened in a non-class state of Tennessee. Second sale happened there, too. That's — I mean, abuse of discretion is automatic. The district court said that that would not be something that would preclude class certification because that would — that might result in a lesser damages award or something else or a lower expectation, consumer expectation, than for other class members, but that doesn't defeat class certification. Why is that analysis wrong? Judge Wardlow was on the Sallie panel. Sallie panel reinforced the Supreme Court's Falcon decision, which says that named plaintiffs have to have the same injury and damages as the — as the members of the class they seek to represent. They don't. It's — it's a fundamental part of class certification. It goes all the way back to 1983 with Falcon that class members have to be part of the classes they seek to represent. And the judge — Judge Orrick here specifically made clear that the damages model is only going to measure and punish Nissan for new car vehicle sales, presumably in class states, but these vehicles were sold new in different states, in other states, not the class states. That's a fundamental issue here. That's a pure Comcast issue. That's a Falcon issue. I mean, that in itself warrants reversal. Now, former owners, they created another issue here, too. I mean, they passed on any overpayments, and the majority of district courts to address this have made that clear. Quokk and Bush, we had Judge Alsup there just a couple of months ago, Judge Carney in the Gonzales case. That's a majority view of all district courts. This district court here is an outlier in essentially deferring the issue to say that — essentially adopting an aggregate disgorgement model where the district court would then parcel out different numbers out of some giant number. And that's just not how it works. That's inconsistent with this court's kind of directives. Then we have the class members whose sunroofs never broke. That's 99.85 percent of individuals whose sunroofs never broke their 15-year lifetime of the vehicle. But the theory of injury here is — correct me if I'm wrong — you have to opt into the panoramic sunroof. You have to pay more for it. Is that right, for these vehicles? In some instances — No, I guess — so here's my question. If you have to opt in and pay more for a panoramic sunroof vehicle, was the buyer injured at the point of sale by not being told that the type of sunroof they're purchasing might spontaneously burst at some point in time? Or maybe it might spontaneously burst because external flex or something else weakened it more than other panoramic sunroofs or other sunroofs. So that would cover the whole class, doesn't it? Well, if I could just push back on that. When someone buys a car and our damages expert set this out, multiple factors go into it. And when you're buying a specific model because of different features, and that model happens to have a panoramic sunroof, that's one thing. But I did want to say — But I'm asking about whether this affects only 2 percent of the class or the whole class. That was the point that you were raising. This affects 0.15 percent of the class, and here's why. The 99.85 percent of the class got a sunroof that fully functioned the entire lifetime of their vehicles. And the district court here relied solely on WEN versus Nissan in determining that all of that's irrelevant, that it needs to look at the point of sale, and you don't look at anything after. And that's just wrong. So would it be different if it were 10 percent of sunroofs that spontaneously burst? So if it's only 10 percent, and I'm a buyer and I go and purchase, maybe I spend $1,000 more on a sunroof, I'm not injured as a consumer that I'm buying something that might — I have a 10 percent chance that it spontaneously bursts? That plays into the materiality analysis as well, but — Well, I'm just trying to drill down on why you think class injury is wholly related to the percentage of people that — where it has actually burst, as opposed to the theory that's being presented. WEN plaintiff's theory, fundamental theory, is that 99.85 — that people are not getting — have overpaid because they've bought a sunroof that's not going to last a full 15 years of a vehicle, and — So that it might spontaneously burst. Right. And again, a theory that's out the window. I did just want to flag for the Court that Penn site 819 of WEN is on point here, and it specifically says that in performance — and here is a sunroof performance claim — in performance claims, the district court has to consider differing levels of value based on when and if the issue manifests. And that's important. Aside from that, there's also issues with respect to WEN as to whether it's even binding at this point, because it relies on outdated case law. But once again, WEN also involved an undisputed defect with a common repair solution. Now, I do want to just highlight why this — that performance aspect of WEN is important, and that's because plaintiff's claims here, the durability, performance, prone to very small chance, all of those are tethered to the performance of the sunroofs. Now, Judge Martinez, when he looked at the identical body of evidence, essentially said that plaintiffs here are saying they suffered injury because they overpaid for their vehicles when the cost failed to include the risk of injury, that risk of injury being the risk of overpaying. So, I did also want to raise on damages that, while damages calculations alone typically don't defeat certification, here we have a different situation. And this court has repeatedly admonished that the existence of damages and the necessity for plug-and-play system are important factors to consider there when trying to rely on that maxim to excuse a flawed damages model. I have two more important issues to address. One is standing. All former owners here, godful value. We have the diminution in value claim here was the one pleading the complaint, talking about the host of negative publicity way back in 2017 that caused the delay, caused diminution in value for the plaintiffs. Well, that kind of counteracts materiality, and the fact that this information was public, according to them, has a big impact. On the cause of action on materiality and reliance, the advisory committee notes for Rule 23 make clear that class cases with differing levels of reliance and materiality are ill-suited for certification. Claims here, again, public domain, bears a materiality. Plaintiffs never disclose what should have been said, where, and by whom, and how. On the CLRA claim, we did ask for certification of that. I see that I have just a short period of time left, so I'll save the rest of my time for rebuttal. All right. Thank you, counsel. May it please the Court, Matthew Wessler for the plaintiffs' appellees. I think I'd like to start just by picking up on Judge Sanchez, your series of questions to my opposing counsel about the argument that Nissan leads with, which is that there's no defect at issue here. And, you know, we think that's wrong, and the experts in this case testified specifically and in detail about the nature of the defect in this case. Can you elaborate to me on what actually is the defect? Sure, Your Honor. In essence, it's what Judge Orrick said, which is that the panoramic sunroofs that Nissan used were designed by using large, thermally tempered glass. And the size of those panels, coupled with the process for making them, this thermally tempered process, makes them prone to spontaneous shattering, because the pressures that exist with the glass, as you expand it, as it gets thinner, the pressures become greater on the inside of the glass, and then they can explode unexpectedly. That can be true as someone's driving down the highway. It can be true, as customers testified, the car is parked in a driveway. And what happens is not just that they spontaneously shatter, but the way that they shatter is that the glass explodes in little pieces rained down on the passenger and the driver and in the back seat because of the size of these sunroofs. Did your – did the theory change at class certification? No, Your Honor. It's been consistent throughout the entire life of this case. It's what Judge Orrick recognized. It's the same theory that this Court took up in Beatty, which was, albeit a different manufacturer, the same kind of manufactured process to design these sunroofs. And what you heard in the first part of this argument was Nissan attempting to either reframe the nature of that defect or argue that it doesn't exist, because it says, you know, other aspects create the problem, whether it's, you know, rocks kicking up or debris or attachment points. It's free to argue that to a jury on the merits, but what Judge Orrick recognized in this case is that at Rule 23, the only relevant question is whether the questions in the case can be susceptible to proof on a class-wide basis. And that expert testimony, coupled with the overwhelming evidence from those who purchased these vehicles about their experiences, coupled with Nissan's own employee testimony about the nature of this design, is all evidence that can be shown that this defect existed throughout all of the class vehicles, regardless of model name. Are you arguing that the panoramic sunroof is not living a long enough life? No. It's not that, and I understand, you know, there's been a lot of argument about, on the other side, about Gradzitski and its connection with this case. This is not a life of the vehicle kind of theory that was at issue there. Instead, as one of the experts testified, actually both of them testified in this case, the problem with these sunroofs is that they don't operate. They're prone to spontaneous shatter under normal driving conditions. And I think that's a significant difference between what you've got here and what you've got in Gradzinski. There's another significant difference between this case and that case, which is that in Gradzinski, the expert in that case didn't provide any actual details or explanation for why there was a supposed defect. All the expert in that case said was, well, you know, these things are supposed to last the life of the car, and, you know, they didn't. They didn't provide any specific explanation for why that would be true or why there was a problem with the particular feature. But here you have pages and pages from multiple experts, Dr. Reed, Dr. Hanneman, explaining in detail exactly why this precise way of manufacturing these sunroofs posed this problem. And not only that, but, you know, one of the things that Nissan says in this case is, oh, well, there's another issue here with proving the defect, which is, you know, there wasn't an alternative. There's no, you know, the experts didn't testify to an alternative, and cites to Gradzinski for that proposition. But the experts here, there's a whole section in Dr. Reed's report identifying alternative methods of manufacture that would have eliminated this problem. There are other car manufacturers that sell these kinds of broad panoramic sunroofs that don't employ this tempered glass design. Instead, they use other processes for connecting the glass panels. Was that part of the record before the district court? Absolutely, Your Honor. It's But you're saying there was evidence of comparison to others. This is, I'll just point you right to the record. It's in our supplemental excerpts of record at 685. The whole section, there's a title of that section in the expert report called Alternative Design Choices. So the expert did all of those things to demonstrate the existence of a defect here and compared it with the way that other manufacturers have done it. But just to step back for one second, we're all talking right now about is there a design problem, a defect or not? That is a merits question. The only question at issue in front of Judge Oreck and in front of this Court on appeal now is whether that question is susceptible to proof class-wide. And Judge Oreck looked at all of this and assessed the evidence in the record and said, yes, it is. And this Court's standard of review is really quite circumscribed in this context. It's whether Judge Oreck abused his discretion in balancing the common questions at issue in this case with the potentially individualized ones. And he did that. He balanced them. And he reached the conclusion that there was no predominance problem here. And, you know, I don't think it's the first district court's exercise of its discretion to balance those factors for predominance in the face of actual evidence demonstrating that the issue can be established on a class-wide basis, even if ultimately a jury ends up believing Nissan when it says that there is no defect here or, you know, the nature of this problem that these sunroofs are prone to shattering is somehow caused by another factor. Now, I know you dispute Nissan's claim about the percentage of people that are affected by this. But if you have a small enough percentage, doesn't Grodzinski allow us to then start to question whether there is, in fact, a common design defect? So I want to, you know, sorry, if it's only 0.4 percent or something or some very, very small number, it does lead to a question of is there a common defect that most consumers have faced? So I want to just draw what I think is a pretty important distinction before I answer that question, if you'll permit me, which is we're not talking about in this case, you know, the actual number of cars in which a shattering occurred. What we're talking about is a design problem that makes these sunroofs prone to spontaneous shattering, and a feature here that is a premium feature contained in luxury vehicles for which the consumers would have paid less. And so it doesn't matter whether the breakage rate, which, you know, there is a dispute. No one is really certain about what the breakage rate is. Is it, you know, 2 percent, 10 percent, 15 percent, whatever? It doesn't actually address the specific theory in this case, which isn't about those cars that actually are those consumers who actually experienced a shattered sunroof. It's about the diminution in value of the price that a consumer would have been willing to pay for a sunroof that is prone to spontaneous shatter under normal driving circumstances. And so I think that takes us out of a situation where you need to be concerned about, you know, whether there were any uninjured class members, like in a case in which it is actually about whether the defect manifested itself. That isn't what we've got here. But even if you were in a situation, Your Honor, where, you know, that question was relevant, it is still something that's committed, I think, to the sound discretion of the district judge to balance. This is remember, this is a predominance inquiry. So, you know, how are the common questions in this case going to line up or be addressed? And how are some of the individualized issues in this case going to be addressed? That's a question that is committed to the discretion of the district court. And here, Judge Orrick balanced those questions and reached the conclusion that this case was properly certified under Rule 23. And in Grudzinski, one thing I think is notable about that case is the district court — the district judge in that case reached different conclusions about whether the experts were — you know, should be admitted under Daubert, whether the class should be certified. It came to the conclusion that the experts should not be admitted. It came to the conclusion that the class should not be certified. And what this Court said is, we think there was no abuse of discretion in the district court's assessment of those questions. The same kind of — of standard of review applies here. Neeson is — is understandably upset that Judge Orrick reached opposite conclusions regarding the nature of these experts and the suitability of this case for treatment under Rule 23. But it doesn't change the fact that the question is whether the district judge abused its discretion and how it balanced those questions. Counsel, can you address Mr. Ntsihe's point about vehicles sold out of state or in non-class states? Sure. He was bringing it up in the context of a damages bundle, but it almost sounded more like a class representative issue. I think it's a little hard to pin down exactly where Neeson locates that argument. If it's just a damages question, it doesn't impact Rule 23 analysis in any meaningful way. It's a question that — that just is ministerial at the end of a case, how much any individual class member would recover. There is, I don't think, a dispute that the way that Judge Orrick assessed the damages question in this case was to say, I'm only evaluating — and this is how our experts did it — only evaluating damages based on the first point of sale for used in new cars. And that sets a uniform way of measuring damages. Whether an individual class member would be entitled to something less because of what happened down the line isn't — isn't an individualized issue that affects how this case gets tried to a jury. It only affects a claims processing question about how much any individual will recover. From the class representative problem, if you're arguing that this tendency toward shattering should have been disclosed, there's no duty, right, on the — the person — not Neeson, but the person who's selling the car, the third party, to disclose. So I don't understand how they could adequately represent the other class.  So I think the way that this would work — and this Court addressed something similar in its en banc decision in Olien. The price premium, that's what we're talking about here, is that the initial failure to disclose allowed Neeson to charge more for the vehicle than it otherwise would have. That carries through all the way down the line. And so it sets an artificially high baseline for the price of a particular car.  But if someone knew that it was a fact that the sunroof that they're buying for their car was going to shatter, or was more likely to shatter, possibly while they were in it, why would they buy the car at all? Well, I mean, I — I don't disagree with that. I think they may choose, you know, to purchase a different vehicle. What Neeson argues is that the — the likelihood is so low that people wouldn't care about it. And what we say is the way you evaluate whether somebody would care about this and the — the amount that a person would attach to a — to a luxury feature like a sunroof can be calculated through this conjoint analysis. And the failure to disclose here allowed Neeson to set a higher price than it would have otherwise paid. Now, the — the question I think — I think I hear you asking, Your Honor, is, you know, why would anybody purchase one of these cars? I think that goes to materiality, which is another element that Neeson challenges in this case. I think your instinct aligns with the — the instinct that the panel had in — in Beatty when it looked at the exact same question, albeit under — The merits question, too, though, right? I'm sorry, Your Honor? That could be a merits question, too. It absolutely could be something that Neeson would raise and — and argue to a jury one way or the other. But in — in Beatty, this Court looked at this materiality question. It — it was — it was a different manufacturer, but the manufacturer there argued much — much the same way that Neeson is arguing here, that because this is an unlikely event, according to the manufacturer, people don't care about it. And what — what Beatty said about that, it said two things about materiality. The first thing it said was, this is absolutely material because it's a luxury item that consumers would attach importance to. It's something that they buy over and above something else. And for that reason, if they were to know that it's prone to spontaneous shattering, that is going to affect their purchasing decision. The second thing that Beatty said on materiality is, this is a safety issue. And — and there's expert testimony in the record in this case from Dr. Haneman that this poses a safety concern for both passengers and drivers when they're driving. And in Beatty, the Court said, look, consumers care about safety issues. There's almost no safety issue that a consumer isn't going to attach importance to. And both of those — both of those factors are present in this case, supported by the record evidence. They were — they were identified by Judge Orrick in support of his class certification decision. And, you know, I think one thing that's — Judge Sanchez, you — you — you flagged Lytle as a decision that came out after the parties had briefed this — this appeal. But in addition to, I think, making clear that the kind of conjoint damages analysis that the experts here proposed and that Judge Orrick said was — was a perfectly legitimate way to — to measure damages across the class, the other, I think, notable aspect of the — this Court's decision in Lytle is that it takes on many of the same arguments that Nissan is making here about materiality, which is, you know, it says, look, people just don't care about this, and we have evidence in the record to support that. And what Lytle said — But can I — actually, I wanted to ask you about that. Because in Lytle, plaintiffs there did present evidence of materiality about this NutriMax product and — and — and — Well, so — But — but I don't think there was any evidence of materiality in this case. And is that a problem for you? So I — so I — I think there absolutely was evidence of materiality in this case. And let me point you just specifically to where it is. First of all, one of the things that — that this Court relied on in Lytle for support of — or to identify evidence was testimony from the named plaintiffs saying, this mattered to me. That was — that was one, I guess, bucket of evidence you could say in Lytle. Okay? Here you have every single one of the named plaintiffs in this case saying exactly the same thing about the importance of this issue and how much it mattered. That's number one. Number two, what — the other bucket of evidence that Lytle identifies is expert testimony about materiality. Well, here you have that, too. Dr. Haneman testifies. He's one of the experts, testifies in this case that — that this issue is a safety concern. So that's the expert testimony. And Judge Orrick flags this. He says, look, that is — that is expert testimony demonstrating materiality. It's the same kind of evidence, again, that this Court in Beatty identified as demonstrating materiality. But — but to just take a step back from that, Your Honor, I think the problem with Nissan's argument is it fails to grapple with the fact that materiality is an objective inquiry, which is why it's — it's — this Court has said on multiple occasions it's — it's almost like the perfect kind of question that's suitable for class-wide treatment because it asks an objective question whether a reasonable consumer would care about the particular defect or — or whether it would — would matter to them in some way. Not whether, you know, there's any subjective, individualized question about whether this particular consumer or that particular consumer cares. It's an objective inquiry. And because it's objective — and this gets us back, I think, to where we started — because it's objective, it can be decided one way or the other on a class-wide basis. And so Nissan, again, would be free to come in in front of a jury and say, you know what? People don't care about this. It's so unlikely. Or, you know, we can show you the breakage rates and, you know, it doesn't happen that often. And, you know, for that reason, no one should care about it. And a jury would be free to reach conclusion that actually this is not material to most consumers. And if it were to do that, what would — what you'd have here would be a case that would fail class-wide. If — if safety is not an issue, do you have a tougher argument to make for materiality? I think it's — Because we can't also presume that it's material simply because it's an objective standard, right? Well, I think — I think under — Or that it's automatic, rather. I mean, you might be able to presume it, but — Well, so two things to say on that. First, now, again, we're at the Rule 23 stage. So all that — all that Judge Orrick was — was permitted to ask is whether it's susceptible to common proof, not did you prove it. Okay? That's a question for the merits. So we're not really in a world in which it matters if there was a safety concern or not. But — but here, I don't think this Court really needs to reach that question. And I'll just give you the — I was looking for the pin site earlier, but — but this is at SER, so our supplemental excerpts of record 696 to 710. That's Dr. Hanneman's report. And — and — and what he says is that these — these moonroofs, their propensity to spontaneously shatter, I'm just going to quote here, is dangerous for drivers and passengers. It's not only potentially likely to injure them, but it can startle them when they're on the road. And — and he identifies that specifically as a safety concern. So I think, you know, regardless of whether in a different case, in the absence of, you know, a potential safety issue, is this a material thing, here you have that in the record. It is evidence that can establish materiality on a class-wide basis, and that is all that's necessary at this stage to affirm Judge Orrick's exercise of discretion to certify the class, unless the Court has any further questions. Thank you. Okay. Thank you very much. Johnson — oh, I'm sorry. You — you wanted to have some rebuttal. I'll give you a couple minutes, because you were already. Thank you, Your Honor. So I'll — I'll just pick off right — right where Counsel left off on materiality. As Judge Sanchez observed, there was no evidence of materiality presented in this case, and evidence of materiality is needed to get any kind of inference. We've presented the Vizcarra v. Unilever case, which sets out the reason, rationale, and background to that. Counsel did reference that named plaintiffs' deposition testimony supports materiality, and that's just incorrect. Now, I'll just give one example. A plaintiff, Patricia Sullivan of Florida — and this is at Volume 6, Excerpts of Record, 1304 to 1305 — her focus on materiality is based solely on whether there was an external cause, an external impact. And that was a debate she had at deposition. And at this point, it's undisputed that there's an external cause for all of these. That's in the Reid report that this Court has. That's in the Hanneman report. Plaintiffs did a 180-degree turn, and they — they had to. There's unrefuted evidence from our expert, Paul Verghese, who's the only one to have inspected the class named plaintiffs' vehicles, the four that were available, and every one of those showed evidence of hard external impacts. And so that's key to materiality analysis. I think the damages issue in relation to the sales that happened, the overpayment that's alleged to have happened on first sale, that's a standing issue as much as a damages issue. If you have — you're essentially punishing Nissan for the first sale for the Johnson vehicle in Nevada, and the first sale of the New York plaintiff, Mishiranian's vehicle in Tennessee, and the second sales that happened in those respective states, too, that's what's being punished here for the overpayment. Now, it's interesting that counsel referenced their diminution and model — diminution and value model, and I'm — I'd just like to hone in on that, because plaintiffs did not present a diminution and value model. And that's key here. That kind of breaks the entire chain of causation there. Now, on Friday, a plaintiff submitted a 28-J letter response, relying on and raising with his court the Spearley v. GM case out of the Sixth Circuit. That case supports us entirely, and here's why. In that case, there was an overpayment theory that was presented for just current owners, and to support that overpayment theory and present — and get standing for — for that class of current owners, plaintiffs presented evidence of 100 percent manifestation, likelihood of 100 percent manifestation. Now, in Spearley, they also presented a separate model, a reduced resale value model for former owners to give them standing. We don't have that here. That knocks out the Colorado plaintiff and also the New York plaintiff or former for their vehicles. So this is standing issues here, and the — there was legal error committed here on that. I did just want to just hit two more points, and that is plaintiffs were asked to describe the defect here. And all they are able to focus on is that it's — the sun — panoramic sunroofs are prone to spontaneous shattering. Compare to what? There's no baseline here, and you'll — this Court will hear in the next argument in relation to Judge Statham and her ruling in the Sonneveld case, which also is directly on point. It was a summary judgment decision, but that led to decertification, and the issues there were highlighted as kind of materiality issues based on the — in the absence of comparative data, and at the same time, the need for comparative data was explained there. And that does apply for Rule 23 as well. That applies because you have to have a common defect to unite all these class members to be able to show that the prone to spontaneous shattering, that there's something there when you compare it against a regular sunroof. Let's not forget that plaintiffs and Judge Oreck relied upon consumer complaints and reports in the complaints and elsewhere, and more than a third of those involved regular sunroofs, which plaintiffs take no issue with. And once you proportionalize them, it ends up being about even, but we need to remember that. We're the only ones — Nissan's the only ones who presented comparative data. It wasn't under-inclusive. That's why there was no 702 challenge to it, and it included things beyond warranty. It included Techline. It included NHTSA complaints. But don't just take our word for it. NHTSA did the longest investigation in its history on this issue, and they did a thorough survey, and their survey identified the 12 — of 13 automakers, their survey identified the 12 vehicles with — which had high incident rates. Not a single one of them was a Nissan vehicle. The — and I see my time is almost up, but — No, your time is entirely up. And if there are any other questions? Okay. Thank you, Counsel. Johnson v. Nissan North America will be submitted, and we will hear from Sonnenfeld v. Mazda Motor of America. Thank you for your time.
judges: WARDLAW, SANCHEZ, Lynn